**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| KRISTI GREGG, *individually and on behalf of all others similarly situated*,<br><br>                              Plaintiff,<br><br>      v.<br><br>THE UNIVERSITY OF MISSOURI SYSTEM and PROGRESS SOFTWARE CORPORATION,<br><br>                              Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Kristi Gregg ("Plaintiff") brings this Class Action Complaint, individually and on behalf of all others similarly situated (the "Class Members"), against Defendants The University of Missouri System (the "UM System") and Progress Software Corporation ("PSC") (collectively, "Defendants") and alleges as follows, based upon information and belief, investigation of counsel, and the personal knowledge of Plaintiff.

## NATURE OF CASE

1.     This class action arises out of the recent targeted cyberattack and data breach where unauthorized third-party criminals retrieved and exfiltrated the highly-sensitive consumer data of Plaintiff, and thousands of Class Members, via a security vulnerability in PSC's software program, MOVEit, which is used by the UM System to transfer and/or exchange sensitive information and documents (the "Data Breach").[1] After learning of the Data Breach, the UM System waited over two months to notify affected individuals.[2]

---

[1] *See* THE UNIVERSITY OF MISSOURI SYSTEM, *University of Missouri System provides update on MOVEit data breach involving outside university vendors*, https://www.umsystem.edu/ums/news/news_releases/202308161858672516_news (last visited Dec. 12, 2023); *see also* Data Breach Notice, **Exhibit A**.
[2] *See* Data Breach Notice, **Exhibit A**.

2.    Defendant UM System is a public land-grant research university in Columbia, Missouri. The UM System acquires, collects, and stores its employees' and students' personal data, including personally identifying information ("PII") and other sensitive personal information (collectively, "Private Information").

3.    Defendant PSC is a provider of file transfer software and advertises itself as an "experienced, trusted provider of products designed with you, our customers, in mind. With Progress, you can build what you need, deploy where and how you want, empower your customers, then manage it all safely and securely."[3]

4.    According to the UM System, the Private Information compromised in the Data Breach includes: names, dates of birth, and Social Security numbers.[4]

5.    The UM System failed to adequately safeguard Plaintiff's and Class Members' highly sensitive Private Information that it collected and maintained. Specifically, the UM System and/or its third-party vendors used Defendant PSC's MOVEit software to store and transfer the Private Information of Plaintiff and Class Members, and this Private Information was compromised as a result of a security vulnerability in the MOVEit software.

6.    It is reported that the Data Breach was carried out by notorious Russia-linked ransomware syndicate Cl0p.[5]

---

[3] PROGRESS, https://www.progress.com/company (last visited Dec. 9, 2023).
[4] *See* THE UNIVERSITY OF MISSOURI SYSTEM, *University of Missouri System provides update on MOVEit data breach involving outside university vendors*, https://www.umsystem.edu/ums/news/news_releases/202308161858672516_news (last visited Dec. 12, 2023); *see also* Data Breach Notice, **Exhibit A**.
[5] Stefanie Schappert, *Cl0p dumps all MOVEit victim data on clearnet, threat insiders talk ransom strategy*, CYBERNEWS (Aug. 18, 2023) (updated November 2023), https://cybernews.com/security/clop-publish-all-moveit-victim-ransom-data-clearweb/.

7.     Based on the notice posted on its website, the UM System admits that Plaintiff's and Class Members' Private Information was accessed and compromised by an unauthorized third party.[6]

8.     The UM System owed a non-delegable duty to Plaintiff and Class Members to implement reasonable and adequate security measures to protect their Private Information. Yet, the UM System maintained and shared the Private Information in a negligent and/or reckless manner. In particular, the Private Information was maintained on computer systems in a condition vulnerable to cyberattacks. Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiff's and Class Members' Private Information was a known risk to the UM System, and the UM System was therefore on notice that failing to take steps necessary to ensure its vendors, including Defendant PSC, properly safeguarded Plaintiff's and Class Members' Private Information from those risks left that Private Information in a vulnerable condition.

9.     Plaintiff's and Class Members' Private Information was compromised due to Defendants' negligent and/or careless acts and omissions and the failure to reasonably and adequately protect Plaintiff's and Class Members' Private Information.

10.     Armed with the Private Information accessed in the Data Breach, data thieves can commit a variety of crimes including opening new financial accounts and taking out loans in Class Members' names, using Class Members' names to obtain medical services, using Class Members' Private Information to target other phishing and hacking intrusions, using Class Members' Private

---

[6] *See* THE UNIVERSITY OF MISSOURI SYSTEM, *University of Missouri System provides update on MOVEit data breach involving outside university vendors*, https://www.umsystem.edu/ums/news/news_releases/202308161858672516_news (last visited Dec. 12, 2023);

Information to obtain government benefits, and filing fraudulent tax returns using Class Members'
Private Information.

11.    As a result of the Data Breach, Plaintiff and Class Members face a substantial risk
of imminent and certainly impending harm, heightened here by the loss of Social Security
numbers, a class of Private Information which is particularly valuable to identity thieves. Plaintiff
and Class Members have and will continue to suffer injuries associated with this risk, including
but not limited to a loss of time, mitigation expenses, and anxiety over the misuse of their Private
Information.

12.    This risk is even more pronounced given the extended amount of time that lapsed
between when the Data Breach occurred, when Defendants reportedly determined Plaintiff's and
Class Members' Private Information was compromised, and when Defendants actually notified
Plaintiff and Class Members about the Data Breach.

13.    Even those Class Members who have yet to experience identity theft have to spend
time responding to the Data Breach and are at an immediate and heightened risk of all manners of
identity theft as a direct and proximate result of the Data Breach. Plaintiff and Class Members
have incurred, and will continue to incur, damages in the form of, among other things, identity
theft, attempted identity theft, lost time and expenses mitigating harms, increased risk of harm,
damaged credit, diminished value of Private Information, loss of privacy, and/or additional
damages as described below.

14.    Accordingly, Plaintiff brings this action against Defendants, seeking redress for
Defendants' unlawful conduct and asserting claims for: (i) negligence; (ii) breach of implied
contract; (iii) unjust enrichment; (iv) bailment; and (v) breach of fiduciary duty. Through these
claims, Plaintiff seeks damages in an amount to be proven at trial, as well as injunctive and other

equitable relief, including improvements to Defendants' data security systems, policies, and practices, future annual audits, and adequate credit monitoring services funded by Defendants.

## THE PARTIES

15.    Plaintiff Kristi Gregg is a natural person, resident, and citizen of the State of Missouri, residing in Boone County.

16.    Defendants obtained and continue to store and maintain Plaintiff's Private Information and owe Plaintiff a legal duty and obligation to protect her Private Information from unauthorized access and disclosure. Plaintiff's Private Information was compromised and disclosed as a result of Defendant's inadequate data security practices, which resulted in the Data Breach.

17.    Plaintiff received a notice letter dated October 18, 2023 from Defendant UM System, stating that an unauthorized party accessed Plaintiff's Private Information which she had previously provided to Defendant.

18.    Defendant The University of Missouri System is a Missouri benevolent corporation and public land-grant research university in Columbia, Missouri.

19.    Defendant, Progress Software Corporation, is a Delaware corporation and maintains its headquarters and principal place of business at 15 Wayside Road, 4th Floor, Burlington, Massachusetts 01803.

## JURISDICTION AND VENUE

20.    This Court has original jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) because at least one member of the putative Class, as defined below, is a citizen of a different state than Defendants, there are more than 100 putative class members, and the amount in controversy exceeds $5 million exclusive of interest and costs.

21.     This Court has general personal jurisdiction over Defendants because Defendants operate in and direct commerce at this District.

22.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant PSC's principal place of business is located in this District, a substantial part of the events giving rise to this action occurred in this District, and Defendants have harmed Class Members residing in this District.

## DEFENDANTS' BUSINESSES

23.     On information and belief, in the ordinary course of its business, Defendant the UM System maintains the Private Information of consumers, including but not limited to:

- Name, address, phone number and email address;

- Date of birth;

- Demographic information;

- Social Security number or taxpayer identification number;

- Financial information;

- Other information that the UM System may deem necessary to provide services.

24.     Additionally, the UM System may receive Private Information from other individuals and/or organizations that are affiliated with its employees, students, and retirees.

25.     Because of the highly sensitive and personal nature of the information Defendants acquire and store with respect to its employees, students, retirees, and other individuals, Defendants, upon information and belief, promise to, among other things: keep Private Information private; comply with financial services industry standards related to data security and Private Information, including FTC guidelines; inform consumers of their legal duties and comply with all federal and state laws protecting consumer Private Information; only use and release

Private Information for reasons that relate to the services Plaintiff and Class Members obtain from Defendant and provide adequate notice to individuals if their Private Information is disclosed without authorization.

26.     However, Defendants did not maintain adequate security to protect their systems from infiltration by cybercriminals, and they waited over two months to publicly disclose the Data Breach to consumers.

27.     By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, Defendants assumed legal and equitable duties and knew or should have known that they were responsible for protecting Plaintiff's and Class Members' Private Information from unauthorized disclosure.

28.     Yet, contrary to Defendants' representations, Defendants failed to implement adequate data security measures, as evidenced by Defendants' admission of the Data Breach, which affected thousands of the UM System's employees, students, and retirees.

## THE DATA BREACH AND NOTICE LETTER

29.     According to the notice posted on the UM System website[7] and the notice letter sent to Plaintiff Kristi Gregg dated October 18, 2023[8] (the "Data Breach Notice"), the UM System and/or its outside vendors used software made by Defendant PSC (MOVEit), which was subject to a cybersecurity attack that allowed unauthorized parties to access and compromise Plaintiff's and Class Members' Private Information between May 28 and 31, 2023.[9]

---

[7] *See* THE UNIVERSITY OF MISSOURI SYSTEM, *University of Missouri System provides update on MOVEit data breach involving outside university vendors*,
https://www.umsystem.edu/ums/news/news_releases/202308161858672516_news (last visited Dec. 12, 2023).
[8] *See* Data Breach Notice, **Exhibit A**.
[9] *Id.*

30.     On May 31, 2023 Defendant PSC alerted the UM System to a previously unknown vulnerability affecting the MOVEit software. In response, the UM System "immediately began investigating to determine if it was among one of the thousands of [PSC] customers affected."[10]

31.     According to the Data Breach Notice, the UM System confirmed that the affected information included: names, dates of birth, and Social Security numbers belonging to its current and former employees, students, and retirees.[11]

32.     The UM System waited nearly four months from the date of the Data Breach, and over two months from the date it learned of the Data Breach and the highly sensitive nature of the Private Information impacted, to publicly disclose the data breach and notify affected individuals.

33.     In the aftermath of the Data Breach, the UM System has not indicated any measures it has taken to mitigate the harm. There is no indication that the UM System's current data security practices and procedures are adequate to protect Plaintiff's and Class Members' Private Information going forward.

34.     According to the UM System, Plaintiff's and Class Members' Private Information was exfiltrated and stolen in the Data Breach.

35.     The accessed data contained Private Information that was accessible, unencrypted, unprotected, and vulnerable for acquisition and/or exfiltration by the unauthorized actor.

36.     As an entity that collects, creates, and maintains significant volumes of Private Information, the targeted attack was a foreseeable risk which the UM System was aware of and knew it had a duty to guard against. It is well-known that sophisticated business entities and their business associates such as Defendants, which collect and store the confidential and sensitive

---

[10] *See id.*
[11] *See id.*

Private Information of millions of individuals, are frequently targeted by cyberattacks. Further, cyberattacks are highly preventable through the implementation of reasonable and adequate cybersecurity safeguards, including proper employee cybersecurity training.

37.    The targeted cyberattack was expressly designed to gain access to and exfiltrate private and confidential data, including (among other things) the Private Information of individuals, like Plaintiff and Class Members.

38.    Defendants had obligations created by contract, industry standards, common law, and their own promises and representations made to Plaintiff and Class Members to keep their Private Information confidential and protected from unauthorized access and disclosure.

39.    Plaintiff and Class Members entrusted Defendants with their Private Information with the reasonable expectation and mutual understanding that Defendants would comply with their obligations to keep such information confidential and secure from unauthorized access.

40.    By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, Defendants assumed legal and equitable duties and knew, or should have known, that they were responsible for protecting Plaintiff's and Class Members' Private Information from unauthorized disclosure.

41.    Due to Defendants' inadequate security measures and their delayed notice to victims, Plaintiff and Class Members now face a present, immediate, and ongoing risk of fraud and identity theft that they will have to deal with for the rest of their lives.

42.    According to published reports, the Defendants fell victim to a MOVEit Transfer attack, originating from a zero-day vulnerability and carried out by Russia-linked ransomware syndicate Cl0p.

43.     MOVEit Transfer is a managed file transfer software. The zero-day vulnerability affected MOVEit Transfer's servers, allowing attackers to access and download the data stored there, including that of Defendants.

44.     Cl0p posted on their dark web blog that they had taken Defendants' data.

45.     The Cl0p ransomware gang has taken credit for exploiting the MOVEit zero-day bug. They claim to have breached hundreds of companies in the process.

46.     So far, over 2000 organizations have fallen victim to the MOVEit attacks, with the estimated number of exposed people exceeding 72 million. Cl0p has been posting victims' names on their dark web leak site since June 14, 2023 The extent of the exposed data depends on how a certain company uses the file transfer system.

47.     Cl0p operates under the Ransomware-as-a-Service (RaaS) mode, which means that it rents the software to affiliates for a pre-agreed cut of the ransom payment.

48.     Cl0p employs the "double-extortion" technique of stealing and encrypting victim data, refusing to restore access, and publishing exfiltrated data into its data leak site if the ransom is not paid. On information and belief, Defendants did not pay a ransom to Cl0p.

**The Data Breach was a Foreseeable Risk of which Defendants Were on Notice**

49.     As an entity handling confidential data belonging to its employees, students, and retirees, the UM System's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in industries holding significant amounts of Private Information preceding the date of the Data Breach.

50.     At all relevant times, the UM System knew, or should have known that Plaintiff's and Class Members' Private Information was a target for malicious actors. Despite such knowledge, the UM System failed to implement and maintain reasonable and appropriate data

privacy and security measures to protect Plaintiff's and Class Members' Private Information from cyberattacks that it should have anticipated and guarded against.

51.     In light of recent high profile data breaches, Defendants knew or should have known that their electronic records would be targeted by cybercriminals and ransomware attack groups.

52.     Cyberattacks and data breaches of entities storing sensitive personal information are especially problematic because of the potentially permanent disruption they cause to the daily lives of their customers. Stories of identity theft and fraud abound, with hundreds of millions of dollars lost by everyday consumers every year as a result of internet-based identity theft attacks.[12]

53.     The U.S. Government Accountability Office ("GAO") released a report on data breaches in 2007 ("GAO Report"), finding that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[13]

54.     The FTC recommends that identity theft victims take several steps to protect their personal health and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (and to consider an extended fraud alert that lasts for seven years if identity theft occurs), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[14]

---

[12] Albert Khoury, *Scam alert: 5 most costly data breaches (plus 5 states most targeted)* (July 27, 2022), https://www.komando.com/security-privacy/most-costly-data-breaches/847800/

[13] *See* U.S. Gov. Accounting Office, *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* ("GAO Report") at 2, GAO (June 2007), https://www.gao.gov/assets/270/262899.pdf [https://perma.cc/GCA5-WYA5].

[14] *Identity Theft Recovery Steps*, FTC, https://www.identitytheft.gov/Steps (last visited Dec. 12, 2023) [https://perma.cc/ME45-5N3A].

55.     Cybercriminals use stolen PII such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

56.     Identity thieves can also use Social Security numbers to obtain a driver's license or other official identification card in the victim's name, but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, seek unemployment or other benefits, and may even give the victim's PII to police during an arrest, resulting in an arrest warrant being issued in the victim's name. A study by the Identity Theft Resource Center ("ITRC") shows the multitude of harms caused by fraudulent use of personal and financial information:[15]

---

[15] Jason Steele, *Credit Card and ID Theft Statistics*, CREDITCARDS.COM (updated Oct. 24, 2017), https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276.php [https://web.archive.org/web/20171215215318/https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276.php].



57.     As set forth above, 96.7 percent of study subjects experienced costs or other harms

as a result of criminal activity in their name.[16] As illustrated in the above graphic, this includes

devastating results such as "I lost my home/place of residence" and "I couldn't care for my

family." Moreover, the harms of identity theft are not limited to the affected individual and may

adversely impact other associated persons and support systems, including government assistance

programs. In the ITRC study, nearly one third of survey respondents had to request government

assistance as a result of the identity theft, such as welfare, EBT, food stamps, or similar support

systems.[17] The ITRC study concludes that "identity theft victimization has an extreme and adverse

effect on each individual as well as all of the support systems and people associated with the

---

[16] *Id.*

[17] *Id.*

individual."[18]

58.    The PII exfiltrated in the Data Breach can also be used to commit identity theft by placing Plaintiff and Class Members at a higher risk of "phishing," "vishing," "smishing," and "pharming," which are other ways for cybercriminals to exploit information they already have in order to get even more personally identifying information from a person through unsolicited email, text messages, and telephone calls purportedly from a legitimate company requesting personal, financial, and/or login credentials.

59.    Notably, there may be a substantial time lag—measured in years—between when harm occurs and when it is discovered, and between when PII and/or financial information is stolen and when it is used. According to the GAO, which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[19]

60.    PII is such an inherently valuable commodity to identity thieves that, once compromised, criminals often trade the information on the dark web for years.

61.    Furthermore, data breaches that expose personal data, and in particular non-public data of any kind directly and materially increase the chance that a potential victim will be targeted by a spear phishing attack in the future, and spear phishing results in a high rate of identity theft, fraud, and extortion.[20]

---

[18] *Id.*
[19] GAO Report, *supra* n.12**Error! Bookmark not defined.**, at 29.
[20] *See* Leo Kelion & Joe Tidy, *National Trust Joins Victims of Blackbaud Hack*, BBC News (July 30, 2020), https://www.bbc.com/news/technology-53567699 (concluding that personal

62.     There is a strong probability that entire batches of stolen information from the Data Breach have yet to be made available on the black market, meaning Plaintiff and Class Members will remain at an increased risk of fraud and identity theft for many years into the future. Thus, as the respective Data Breach Notices advise, Plaintiff must vigilantly monitor her financial accounts for many years to come.

63.     As a highly sophisticated party that handles sensitive Private Information, Defendants failed to establish and/or implement appropriate administrative, technical and/or physical safeguards to ensure the security and confidentiality of Plaintiff's and Class Members' Private Information.

64.     The ramifications of Defendants' failure to keep Plaintiff's and Class Members' Private Information secure are severe and long-lasting. To avoid detection, identity thieves often hold stolen data for months or years before using it. Also, the sale of stolen information on the "dark web" may take months or more to reach end-users, in part because the data can be sold in small batches to multiple buyers as opposed to in bulk to a single buyer. Thus, Plaintiff and Class Members must vigilantly monitor their financial accounts, and Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future.

65.     Thus, Defendants knew, or should have known, the importance of safeguarding the PII entrusted to it and of the foreseeable consequences if their systems were breached. Defendants failed, however, to take adequate cybersecurity measures to prevent the Data Breach from

---

information such as "names, titles, telephone numbers, email addresses, mailing addresses, dates of birth, and, more importantly, donor information such as donation dates, donation amounts, giving capacity, philanthropic interests, and other donor profile information.... in the hands of fraudsters, [makes consumers] particularly susceptible to spear phishing—a fraudulent email to specific targets while purporting to be a trusted sender, with the aim of convincing victims to hand over information or money or infecting devices with malware").

occurring.

## Defendants Fail to Comply with FTC Guidelines

66.     The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should factor into all business decision-making.

67.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[21] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and, have a response plan ready in the event of a breach.[22]

68.     The FTC further recommends that companies not maintain PII longer than necessary for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

---

[21] *Protecting Personal Information: A Guide for Business*, FEDERAL TRADE COMMISSION (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.
[22] *Id.*

69.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

70.     Defendants failed to properly implement basic data security practices.

71.     Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to consumers' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

72.     Defendants were at all times fully aware of their obligation to protect the Private Information of consumers. Defendants were also aware of the significant repercussions that would result from their failure to do so.

**Defendants Fail to Comply with Industry Standards**

73.     As shown above, experts studying cybersecurity routinely identify entities like Defendants as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

74.     Several best practices have been identified that at a minimum should be implemented by entities like Defendants, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and limiting which employees can access sensitive data.

75.    Other best cybersecurity practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

76.    On information and belief, Defendants failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

77.    These foregoing frameworks are existing and applicable industry standards, and Defendants failed to comply with these accepted standards, thereby opening the door to the cyber incident and causing the data breach.

### Cyberattacks and Data Breaches Cause Disruption and Put Consumers at an Increased Risk of Fraud and Identity Theft

78.    Cyberattacks and data breaches at entities like Defendants are especially problematic because they can negatively impact the overall daily lives of individuals affected by the attack.

79.    The United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft face "substantial costs and time to repair the damage to their good name and credit record."[23]

---

[23] *See* U.S. Gov. Accounting Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is

80.     That is because any victim of a data breach is exposed to serious ramifications regardless of the nature of the data. Indeed, the reason criminals steal PII is to monetize it. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims, and take over victims' identities to engage in illegal financial transactions under the victims' names. Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

81.     The FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[24]

82.     Identity thieves use stolen Private Information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

---

Unknown (June 2007), *available at* https://www.gao.gov/new.items/d07737.pdf.

[24] *See IdentityTheft.gov*, Federal Trade Commission, https://www.identitytheft.gov/Steps (last visited Aug. 24, 2023).

83.     Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information.  In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name.

84.     Moreover, theft of Private Information is also gravely serious because Private Information is an extremely valuable property right.[25]

85.     Its value is axiomatic, considering the value of "big data" in corporate America and the fact that the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

86.     It must also be noted there may be a substantial time lag – measured in years – between when harm occurs and when it is discovered, and also between when Private Information and/or financial information is stolen and when it is used.

87.     According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years.

---

[25] *See, e.g.,* John T. Soma, et al, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

> As a result, studies that attempt to measure the harm resulting from
> data breaches cannot necessarily rule out all future harm.

> *See* GAO Report, at p. 29.

88.     Private Information is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

89.     Thus, Plaintiff and Class Members must vigilantly monitor their financial and medical accounts, or the accounts of deceased individuals for whom Class Members are the executors or surviving spouses, for many years to come.

90.     Private Information can sell for as much as $363 per record according to the Infosec Institute.[26] Private Information is particularly valuable because criminals can use it to target victims with frauds and scams. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years.

91.     For example, the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[27] Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security Numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.[28] Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's

---

[26] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/.
[27] *Identity Theft and Your Social Security Number*, Social Security Administration (July 2021), *available at* https://www.ssa.gov/pubs/EN-05-10064.pdf.
[28] *Id.*

employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

92.     Moreover, it is not an easy task to change or cancel a stolen Social Security number.

93.     An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[29]

94.     This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."[30]

95.     Because of the value of their collected and stored data, businesses entrusted with valuable Private Information have experienced disproportionally higher numbers of data theft events than other industries.

96.     For this reason, Defendants knew or should have known about these dangers and strengthened their data and email handling systems accordingly. Defendants were on notice of the substantial and foreseeable risk of harm from a data breach, yet Defendants failed to properly prepare for that risk.

---

[29] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft.

[30] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, Computer World (Feb. 6, 2015), http://www.itworld.com/article/2880960/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

## **DEFENDANTS' DATA BREACH**

97.     Defendants breached their obligations to Plaintiff and Class Members and/or were otherwise negligent and reckless because they failed to properly maintain and safeguard their computer systems and data. Defendants' unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a.      Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

b.      Failing to adequately protect individuals' Private Information;

c.      Failing to properly monitor their own data security systems for existing intrusions;

d.      Failing to ensure that vendors with access to their computer systems and data employed reasonable security procedures;

e.      Failing to train their employees in the proper handling of emails containing Private Information and maintain adequate email security practices;

f.      Failing to comply with FTC guidelines for cybersecurity, in violation of Section 5 of the FTC Act;

g.      Failing to adhere to industry standards for cybersecurity as discussed above; and

h.      Otherwise breaching their duties and obligations to protect Plaintiff's and Class Members' Private Information.

98.     Defendants negligently and unlawfully failed to safeguard Plaintiff's and Class Members' Private Information by allowing cyberthieves to access Defendants' computer network and systems for multiple days which contained unsecured and unencrypted Private Information.

99.     Accordingly, as outlined below, Plaintiff and Class Members now face an increased risk of fraud and identity theft. In addition, Plaintiff and the Class Members also lost the benefit of the bargain they made with Defendants.

### Plaintiff's and Class Members' Damages

100.    Given the sensitivity of the Private Information involved in this Data Breach, Plaintiff and Class Members have all suffered damages and will face a substantial risk of additional injuries for years to come, if not the rest of their lives. Defendants have done nothing to compensate Plaintiff or Class Members for many of the injuries they have already suffered. Defendants have not demonstrated any efforts to prevent additional harm from befalling Plaintiff and Class Members as a result of the Data Breach.

101.    Plaintiff and Class Members have been damaged by the compromise of their Private Information in the Data Breach.

102.    Plaintiff's and Class Members' demographic information, dates of birth, and Social Security Numbers were all compromised in the Data Breach and are now in the hands of the cybercriminals.

103.    Since being notified of the Data Breach, Plaintiff has spent time dealing with the impact of the Data Breach, valuable time Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation.

104.    Due to the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. This includes changing passwords, cancelling credit and debit cards, and monitoring her accounts for fraudulent activity.

105.    Plaintiff's and Class Members' Private Information was compromised as a direct and proximate result of the Data Breach.

106.    As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have been placed at a present, imminent, immediate, and continuing increased risk of harm from fraud and identity theft.

107.    As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have been forced to spend time dealing with the effects of the Data Breach.

108.    Plaintiff and Class Members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft.

109.    Plaintiff and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on Plaintiff's and Class Members' Private Information as potential fraudsters could use that information to more effectively target such schemes to Plaintiff and Class Members.

110.    Plaintiff and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

111.    Plaintiff and Class Members also suffered a loss of value of their Private Information when it was acquired by cyber thieves in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in similar cases.

112.    Plaintiff and Class Members were also damaged via benefit-of-the-bargain damages. Plaintiff and Class Members overpaid for a service that was intended to be accompanied by adequate data security that complied with industry standards but was not. Part of the price

Plaintiff and Class Members paid to Defendants and/or Defendants' third-party business vendors was intended to be used by Defendants to fund adequate security of their computer system(s) and Plaintiff's and Class Members' Private Information. Thus, Plaintiff and Class Members did not get what they paid for and agreed to.

113.    Plaintiff and Class Members have spent and will continue to spend significant amounts of time monitoring their accounts and sensitive information for misuse.

114.    Plaintiff and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

   a.   Reviewing and monitoring sensitive accounts and finding fraudulent insurance claims, loans, and/or government benefits claims;

   b.   Purchasing credit monitoring and identity theft prevention;

   c.   Placing "freezes" and "alerts" with reporting agencies;

   d.   Spending time on the phone with or at financial institutions, healthcare providers, and/or government agencies to dispute unauthorized and fraudulent activity in their name;

   e.   Contacting financial institutions and closing or modifying financial accounts; and

   f.   Closely reviewing and monitoring Social Security Number, medical insurance accounts, bank accounts, and credit reports for unauthorized activity for years to come.

115.    Moreover, Plaintiff and Class Members have an interest in ensuring that their Private Information, which is believed to remain in the possession of Defendants, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing Private Information is not accessible online and that access to such data is password protected.

116.    Further, as a result of Defendants' conduct, Plaintiff and Class Members are forced to live with the anxiety that their Private Information—which contains the most intimate details about a person's life—may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

117.    As a direct and proximate result of Defendants' actions and inactions, Plaintiff and Class Members have suffered anxiety, emotional distress, loss of time, loss of privacy, and are at an increased risk of future harm.

<u>**Plaintiff's Experience**</u>

118.    Plaintiff provided her Private Information to the UM System.

119.    According to the Data Breach Notice letter Plaintiff received, Plaintiff's personal information was accessed and compromised in the Data Breach.[31]

120.    Upon information and belief, the UM System received, stores, and maintains Plaintiff's Private Information.

121.    Plaintiff is very careful with her Private Information. She stores any documents containing her Private Information in a safe and secure location or destroys the documents. Plaintiff has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Moreover, Plaintiff diligently chooses unique usernames

---

[31] *See* Data Breach Notice, **Exhibit A**.

and passwords for her various online accounts.

122.    As a result of the Data Breach, Plaintiff made reasonable efforts to mitigate the impact of the Data Breach after receiving the data breach notification letter, including but not limited to researching the Data Breach, reviewing credit card and financial account statements, and monitoring her credit.

123.    Plaintiff was forced to spend multiple hours attempting to mitigate the effects of the Data Breach. She will continue to spend valuable time she otherwise would have spent on other activities, including but not limited to work and/or recreation. This is time that is lost forever and cannot be recaptured.

124.    Plaintiff suffered actual injury and damages from having her Private Information compromised as a result of the Data Breach including, but not limited to: (a) damage to and diminution in the value of her Private Information, a form of intangible property that the UM System obtained; (b) violation of her privacy rights; (c) the theft of her Private Information; (d) loss of time; (e) imminent and impending injury arising from the increased risk of identity theft and fraud; (f) failure to receive the benefit of her bargain; and (g) nominal and statutory damages.

125.    Plaintiff has also suffered emotional distress that is proportional to the risk of harm and loss of privacy caused by the theft of her Private Information, which she believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and/or using her Private Information for purposes of identity theft and fraud. Plaintiff has also suffered anxiety about unauthorized parties viewing, using, and/or publishing information related to her Social Security number.

126.    As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In

addition, Plaintiff will continue to be at present, imminent, and continued increased risk of identity theft and fraud in perpetuity.

127.    Plaintiff has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

## CLASS ACTION ALLEGATIONS

128.    Plaintiff brings this action against Defendants individually and on behalf of all other persons similarly situated ("the Class").

129.    Plaintiff proposes the following Class definition, subject to amendment as appropriate:

> **All persons or, if minors, their parents or guardians, or, if deceased, their executors or surviving spouses, who Defendants identified as being among those individuals impacted by the Data Breach, including all who were sent a notice of the Data Breach.**

130.    Excluded from the Class are Defendants' officers, directors, and employees; any entity in which Defendants have a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendants. Excluded also from the Class are members of the judiciary to whom this case is assigned, their families and Members of their staff.

131.    Plaintiff reserves the right to amend or modify the Class definition or create additional subclasses as this case progresses.

132.    <u>Numerosity</u>. The Members of the Class are so numerous that joinder of all of them is impracticable.

133.    <u>Commonality</u>. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common

questions of law and fact include, without limitation:

    a.   Whether Defendants unlawfully used, maintained, lost, or disclosed Plaintiff's and Class Members' Private Information;

    b.   Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

    c.   Whether Defendants' data security systems prior to and during the Data Breach complied with applicable data security laws and regulations including, e.g., the FTC Act;

    d.   Whether Defendants' data security systems prior to and during the Data Breach were consistent with industry standards;

    e.   Whether Defendants owed a duty to Plaintiff and Class Members to safeguard their Private Information;

    f.   Whether Defendants breached their duty to Plaintiff and Class Members to safeguard their Private Information;

    g.   Whether Defendants knew or should have known that their data security systems and monitoring processes were deficient;

    h.   Whether Defendants should have discovered the Data Breach sooner;

    i.   Whether Plaintiff and Class Members suffered legally cognizable damages as a result of Defendants' misconduct;

    j.   Whether Defendants' conduct was negligent;

    k.   Whether Defendants breached implied contracts with Plaintiff and Class Members;

l.  Whether Defendants were unjustly enriched by unlawfully retaining a benefit conferred upon them by Plaintiff and Class Members;

m.  Whether Defendants failed to provide notice of the Data Breach in a timely manner, and;

n.  Whether Plaintiff and Class Members are entitled to damages, civil penalties, punitive damages, treble damages, and/or injunctive relief.

134.  <u>Typicality</u>. Plaintiff's claims are typical of those of other Class Members because Plaintiff's information, like that of every other Class Member, was compromised in the Data Breach.

135.  <u>Adequacy of Representation</u>. Plaintiff will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiff's Counsel are competent and experienced in litigating class actions.

136.  <u>Predominance</u>. Defendants have engaged in a common course of conduct toward Plaintiff and Class Members, in that all the data of Plaintiff and Class Members was stored on the same network and unlawfully accessed in the same way. The common issues arising from Defendants' conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

137.  <u>Superiority</u>. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual

Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendants. In contrast, to conduct this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

138.    Defendants have acted on grounds that apply generally to the Class as a whole, so that Class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

139.    Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

    a.   Whether Defendants failed to timely notify the public of the Data Breach;

    b.   Whether Defendants owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

    c.   Whether Defendants' security measures to protect their data systems were reasonable in light of best practices recommended by data security experts;

    d.   Whether Defendants' failure to institute adequate protective security measures amounted to negligence;

    e.   Whether Defendants failed to take commercially reasonable steps to safeguard consumer Private Information; and

    f.   Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

140.    Finally, all members of the proposed Class are readily ascertainable. Defendants have access to Class Members' names and addresses affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Defendants.

## CLAIMS FOR RELIEF

### COUNT I
**Negligence**

***(On Behalf of Plaintiff and the Class)***

141.    Plaintiff re-alleges and incorporates by reference substantive paragraphs as if fully set forth herein.

142.    By collecting and storing the Private Information of Plaintiff and Class Members, in their computer systems and networks, and sharing it and using it for commercial gain, Defendants owed a duty of care to use reasonable means to secure and safeguard their computer systems—and Plaintiff's and Class Members' Private Information held within—to prevent disclosure of the information, and to safeguard the information from theft. Defendants' duty included a responsibility to implement processes by which they could detect a breach of their security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

143.    Defendants owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that their systems and networks, and the personnel responsible for them, adequately protected the Private Information.

144.    Plaintiff and Class Members are a well-defined, foreseeable, and probable group of consumers that Defendants were aware, or should have been aware, could be injured by inadequate data security measures.

145.    Defendants' duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendants and consumers, which is recognized by laws and regulations including but not limited the FTC Act and common law. Defendants were in a superior position to ensure that their systems were sufficient to protect against the foreseeable risk of harm to Class Members from a data breach.

146.    In addition, Defendants had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair... practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

147.    Defendants' duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendants are bound by industry standards to protect confidential Private Information.

148.    Defendants breached their duties, and thus were negligent, by failing to use reasonable measures to protect Plaintiff's and Class Members' Private Information. The specific negligent acts and omissions committed by Defendants include, but are not limited to, the following:

a.  Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiff's and Class Members' Private Information;

b.  Failing to adequately monitor the security of their networks and systems;

c.  Failing to ensure that their email systems had plans in place to maintain reasonable data security safeguards;

d.  Failing to have in place mitigation policies and procedures;

  e. Allowing unauthorized access to Plaintiff's and Class Members' Private Information;

  f. Failing to detect in a timely manner that Plaintiff's and Class Members' Private Information had been compromised; and

  g. Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

149. Plaintiff and Class Members have no ability to protect their Private Information that was or remains in Defendants' possession.

150. It was foreseeable that Defendants' failure to use reasonable measures to protect Plaintiff's and Class Members' Private Information would result in injury to Plaintiff and Class Members. Furthermore, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches.

151. It was therefore foreseeable that the failure to adequately safeguard Plaintiff's and Class Members' Private Information would result in one or more types of injuries to Plaintiff and Class Members. In addition, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches.

152. Defendants' conduct was grossly negligent and departed from reasonable standards of care, including but not limited to, failing to adequately protect the Private Information and failing to provide Plaintiff and Class Members with timely notice that their sensitive Private Information had been compromised.

153. Neither Plaintiff nor Class Members contributed to the Data Breach and subsequent misuse of their Private Information as described in this Complaint.

154.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to, e.g., (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

155.    The injury and harm Plaintiff and Class Members suffered was the reasonably foreseeable result of Defendants' breach of their duties. Defendants knew or should have known that they were failing to meet their duties, and that Defendants' breach would cause Plaintiff and Class Members to experience the foreseeable harms associated with the exposure of their Private Information.

156.    As a direct and proximate result of Defendants' negligent conduct, Plaintiff and Class Members have suffered injury and are entitled to compensatory and consequential damages in an amount to be proven at trial.

### COUNT II
### Breach of Implied Contract

#### *(On behalf of Plaintiff and the Class)*

157.    Plaintiff re-alleges and incorporates by reference substantive paragraphs as if fully set forth herein.

158.    Defendants acquired, stored, and maintained the Private Information of Plaintiff and Class Members, which it received either directly or indirectly.

159.    When Plaintiff and Class Members provided their Private Information to Defendants, they entered into implied contracts with Defendants, their business associates, and revenue service providers and file transfer software providers, including Defendants.

160.    Plaintiff and Class Members entered into implied contracts with Defendants under which Defendants agreed to safeguard and protect their Private Information and to timely and

accurately notify Plaintiff and Class Members that their Private Information had been breached and compromised.

161.    Plaintiff and Class Members were required to entrust their Private Information to Defendants as part of the process of obtaining services provided by Defendants. Plaintiff and Class Members paid money, or money was paid on their behalf, to Defendants in exchange for services.

162.    The UM System solicited, offered, and invited Plaintiff and Class Members to provide their Private Information as part of Defendant's regular business practices. Plaintiff and Class Members accepted the UM System's offers and provided their Private Information to the UM System. In turn, the UM System provided that same Private Information to Defendant PSC in the course of using Defendant PSC's MOVEit software.

163.    Defendants accepted possession of Plaintiff's and Class Members' Private Information for the purpose of providing services for Plaintiff and Class Members.

164.    In accepting such information and payment for services, Defendants entered into an implied contract with Plaintiff and Class Members whereby Defendants became obligated to reasonably safeguard Plaintiff's and Class Members' Private Information.

165.    Alternatively, Plaintiff and Class Members were the intended beneficiaries of data protection agreements entered into between the UM System and its business associates.

166.    In delivering their Private Information to Defendants, Plaintiff and Class Members intended and understood that Defendants would adequately safeguard the data as part of that service.

167.    The implied promise of confidentiality includes consideration beyond those pre-existing general duties owed under state or federal regulations. The additional consideration included implied promises to take adequate steps to comply with specific industry data security

standards and FTC guidelines on data security.

168.    The implied promises include but are not limited to: (1) taking steps to ensure that any agents who are granted access to Private Information also protect the confidentiality of that data; (2) taking steps to ensure that the information that is placed in the control of their agents is restricted and limited to achieve an authorized business purpose; (3) restricting access to qualified and trained agents; (4) designing and implementing appropriate retention policies to protect the information against criminal data breaches; (5) applying or requiring proper encryption; (6) multifactor authentication for access; and (7) other steps to protect against foreseeable data breaches.

169.    Plaintiff and Class Members would not have entrusted their Private Information to Defendants in the absence of such an implied contract.

170.    Had Defendants disclosed to Plaintiff and the Class that they did not have adequate computer systems and security practices to secure sensitive data, Plaintiff and Class Members would not have provided their Private Information to Defendants.

171.    Defendants recognized that Plaintiff's and Class Members' Private Information is highly sensitive and must be protected, and that this protection was of material importance as part of the bargain to Plaintiff and Class Members.

172.    Plaintiff and Class Members fully performed their obligations under the implied contracts with Defendants.

173.    Defendants breached the implied contract with Plaintiff and Class Members by failing to take reasonable measures to safeguard their Private Information as described herein.

174.    As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members suffered and will continue to suffer damages in an amount to be proven at trial.

## COUNT III
**Unjust Enrichment**

***(On Behalf of Plaintiff and the Class)***

175.    Plaintiff re-alleges and incorporates by reference substantive paragraphs as if fully set forth herein.

176.    This count is pleaded in the alternative to breach of contract.

177.    Upon information and belief, Defendants fund their data security measures entirely from their general revenue, including from money they make based upon protecting Plaintiff's and Class Members' Private Information.

178.    There is a direct nexus between money paid to Defendants and the requirement that Defendants keep Plaintiff's and Class Members' Private Information confidential and protected.

179.    Plaintiff and Class Members paid Defendants and/or their business associates a certain sum of money, which was used to fund data security via contracts with Defendants.

180.    As such, a portion of the payments made by or on behalf of Plaintiff and Class Members is to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendant.

181.    Protecting data from Plaintiff and Class Members is integral to Defendants' businesses. Without their data, Defendant PSC would be unable to provide the software services comprising Defendant PSC's core business.

182.    Plaintiff's and Class Members' data has monetary value.

183.    Plaintiff and Class Members directly and indirectly conferred a monetary benefit on Defendants. They indirectly conferred a monetary benefit on Defendants by purchasing goods and/or services from entities that contracted with Defendants, and from which Defendants received compensation to protect certain data. Plaintiff and Class Members directly conferred a monetary

benefit on Defendants by supplying Private Information, which has value, from which value Defendants derive their business value, and which should have been protected with adequate data security.

184.    Defendants knew that Plaintiff and Class Members conferred a benefit which Defendants accepted. Defendants profited from these transactions and used the Private Information of Plaintiff and Class Members for business purposes.

185.    Defendants enriched themselves by saving the costs they reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Private Information. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendants instead calculated to avoid their data security obligations at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendants' failures to provide the requisite security.

186.    Under the principles of equity and good conscience, Defendants should not be permitted to retain the money belonging to Plaintiff and Class Members, because Defendants failed to implement appropriate data management and security measures that are mandated by industry standards.

187.    Defendants acquired the monetary benefit and Private Information through inequitable means in that they failed to disclose the inadequate security practices previously alleged.

188.    If Plaintiff and Class Members knew that Defendants had not secured their Private Information, they would not have agreed to provide their Private Information to Defendants or to Defendants' business associates.

189.    Plaintiff and Class Members have no adequate remedy at law.

190.    As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity how their Private Information is used; (iii) the compromise, publication, and/or theft of their Private Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their Private Information, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect Private Information in their continued possession; (vii) loss or privacy from the authorized access and exfiltration of their Private Information; and (viii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

191.    As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

192.    Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them. In the alternative, Defendants should be compelled to refund the amounts that Plaintiff and Class Members overpaid for Defendants' services.

## COUNT IV
**Bailment**

### (*On Behalf of Plaintiff and the Class*)

193.    Plaintiff re-alleges and incorporates by reference substantive paragraphs as if fully set forth herein.

194.    Plaintiff and Class Members provided Private Information to Defendants—either directly or indirectly though their business associates—which Defendants were under a duty to keep private and confidential.

195.    Plaintiff's and Class Members' Private Information is personal property, and was conveyed to Defendants for the certain purpose of keeping the information private and confidential.

196.    Plaintiff's and Class Members' Private Information has value and is highly prized by hackers and criminals. Defendants were aware of the risks they took when accepting the Private Information for safeguarding and assumed the risk voluntarily.

197.    Once Defendants accepted Plaintiff's and Class Members' Private Information, they were in the exclusive possession of that information, and neither Plaintiff nor Class Members could control that information once it was within the possession, custody, and control of Defendants.

198.    Defendants did not safeguard Plaintiff's or Class Members' Private Information when they failed to adopt and enforce adequate security safeguards to prevent a known risk of a cyberattack.

199.    Defendants' failure to safeguard Plaintiff's and Class Members' Private Information resulted in that information being accessed or obtained by third-party cybercriminals.

200.    As a result of Defendants' failure to keep Plaintiff's and Class Members' Private Information secure, Plaintiff and Class Members suffered injury, for which compensation—including nominal damages and compensatory damages—are appropriate.

## COUNT V
**Breach of Fiduciary Duty**

***(On Behalf of Plaintiff and the Class)***

201.    Plaintiff re-alleges and incorporates by reference substantive paragraphs as if fully set forth herein.

202.    In light of the special relationship between Defendants and Plaintiff and Class Members, Defendants became a fiduciary by undertaking a guardianship of the Private Information to act primarily for Plaintiff and Class Members, (1) for the safeguarding of Plaintiff's and Class Members' Private Information; (2) to timely notify Plaintiff and Class Members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendants do store.

203.    Defendants had a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of their relationship with their customers, in particular, to keep their Private Information secure.

204.    Defendants breached their fiduciary duty to Plaintiff and Class Members by failing to encrypt and otherwise protect the integrity of the systems containing Plaintiff's and Class Members' Private Information.

205.    Defendants breached their fiduciary duty to Plaintiff and Class Members by otherwise failing to safeguard Plaintiff's and Class Members' Private Information.

206.    As a direct and proximate result of Defendants' breach of their fiduciary duties, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i)

actual identity theft; (ii) the compromise, publication, and/or theft of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their Private Information; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (v) the continued risk to their Private Information, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information in their continued possession; (vi) future costs in terms of time, effort, and money that will be expended as result of the Data Breach for the remainder of the lives of Plaintiff and Class Members; and (vii) the diminished value of Defendants' services they received.

207.    As a direct and proximate result of Defendants' breach of their fiduciary duties, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm, and other economic and non-economic losses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

a)    For an Order certifying this action as a Class action and appointing Plaintiff as Class Representative and her counsel as Class Counsel;

b)    For equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

c)    For equitable relief compelling Defendants to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of Private Information compromised during the Data Breach;

d)    For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendants' wrongful conduct;

e)    Ordering Defendants to pay for not less than five years of credit monitoring services for Plaintiff and the Class;

f)    For an award of actual damages, compensatory damages, statutory damages, nominal damages, and/or statutory penalties, in an amount to be determined, as allowable by law;

g)    For an award of punitive damages, as allowable by law;

h)    Pre- and post-judgment interest on any amounts awarded; and,

i)    Such other and further relief as this court may deem just and proper.

## JURY TRIAL DEMANDED

Under Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable as of right.

Dated: December 13, 2023                    Respectfully submitted,

*/s/ Steven B. Rotman*
Steven B. Rotman (MA Bar No. 558473)
**HAUSFELD LLP**
One Marina Park Drive, Suite 1410
Boston, MA 02210
Tel.: (617) 207-0600
Fax: (617) 830-8312
Email: srotman@hausfeld.com

James J. Pizzirusso
B. Annabelle Emuze*
**HAUSFELD LLP**
888 16th Street, N.W., Suite 300
Washington, D.C. 20006
Tel.: (202) 540-7200
Fax: (202) 540-7201
Email: jpizzirusso@hausfeld.com
Email: aemuze@hausfeld.com

Steven M. Nathan
**HAUSFELD LLP**
33 Whitehall Street, Fourteenth Floor
New York, NY 10004
Tel.: (646) 357-1100
Fax: (212) 202-4322
Email: snathan@hausfeld.com

***Counsel for Plaintiff***

***\*Pro Hac Vice Forthcoming***